IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LISA A. EDWARDS, | ) | Case No. 3:22-CV-00597 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Lisa A. Edwards, seeks judicial review of the final decision of the
Commissioner of Social Security, denying her application for disability insurance benefits
("DIB") under Title II of the Social Security Act.  Edwards challenges the Administrative Law
Judge's ("ALJ") negative findings, contending that the ALJ erred in evaluating her mental health
limitations under Medical Listings 12.04 and 12.06, and misevaluated her residual functional
capacity ("RFC") in light of the opinion evidence from Counselor Teresa Howell and
Dr. Thomas Evans.  Although the ALJ failed to apply the proper legal standards in evaluating
Howell's opinion, because the error was harmless, I recommend that the Commissioner's final
decision denying Edwards's application for DIB be affirmed.

## I.    Procedural History

Edwards applied for DIB on May 15, 2020.  (Tr. 172).[1]  Edwards alleged that she became
disabled on February 29, 2020, due to: depression, bipolar disorder, and anxiety.  (Tr. 192, 205).

---

[1] The administrative transcript appears in ECF Doc. 5.

The Social Security Administration denied Edwards's application initially and upon reconsideration.  (Tr. 67-74, 76-83).  Edwards requested an administrative hearing.  (Tr. 98).

On June 24, 2021, ALJ Dianne Mantel held a telephonic hearing on Edwards's case and denied her application on December 16, 2021.  (Tr. 13-26, 31-65).  In doing so, the ALJ determined at Step Three of the sequential evaluation process that Edwards did not satisfy the requirements of Medical Listings 12.04 or 12.06.  (Tr. 16).  Also, at Step Four, the ALJ found that Edwards had the RFC to perform a full range of work at all exertional levels, except that:

> [Edwards] can understand, remember, and carry out simple, routine tasks but not at a production rate pace such as required working on an assembly line.  She can make judgments on simple work and respond appropriately to usual work situations where duties are generally predictable and handle occasional changes in a routine work setting that are explained in advance and implemented slowly.  She cannot perform work that requires a daily production quota, i.e., piecework, but can perform goal-oriented work and meet end of day production requirements that includes remaining on task for 2-hour segments of time.  She can have no interaction with the general public and occasional interaction with supervisors and coworkers.  However, with coworkers, she cannot engage in tasks that require persuasion, negotiation, or conflict resolution and engage in team or tandem tasks.

(Tr. 18).  Based on vocational expert testimony that a hypothetical individual with Edwards's age, experience, and RFC could work in such available positions as an industrial cleaner, "laundry worker II," and counter supply worker, the ALJ determined Edwards wasn't disabled.  (Tr. 25-26).  On February 28, 2022, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  And, on April 13, 2022, Edwards filed a complaint to obtain judicial review.[2]  ECF Doc. 1.

---

[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

II.     **Evidence**

A.     **Personal, Educational, and Vocational Evidence**

Edwards was born on March 23, 1977 and was 42 years old on the alleged onset date. (Tr. 192).  She had completed four or more years of college in 2019 and had prior work experience as a registered nurse.  (Tr. 206).

B.     **Relevant Medical Evidence**

Because the focus of Edwards's arguments is the ALJ's consideration of her mental health conditions and the related opinion evidence, it is only necessary to summarize the record evidence relevant to her mental health.

Prior to her alleged onset date, in March 2019, Edwards started receiving routine treatment for her mental health under the care of a nurse practitioner and counselor. (Tr. 456-489).  The nurse practitioner, Felicia Nossek, CNS, assessed Edwards with bipolar disorder, current episode mixed, severe, without psychotic features.  (Tr. 489).  She later noted that Edwards had depression related to her bipolar disorder.  (Tr. 475).  Edwards received counseling with Teresa Howell, LPCC, who routinely noted that Edwards was engaged and stated her goal was to help Edwards reduced her anxiety from a 10 to a 6, to help her be able to function daily.  (Tr. 456-460, 465-466, 470, 472, 477-478, 483-486).

On November 25, 2019, Edwards saw Nurse Nossek.  (Tr. 453-455).  Edwards reported that her depression and anxiety symptoms were fair; she did not have any anger or irritability symptoms; she was tired, sleeping 7 to 8 hours a night; and she did not have any medication side effects.  (Tr. 453).  She also reported that she did not have any suicidal thoughts; her conditions had improved, rating her mood as 3/10 (with 10 being the worst); she worked part-time; and was

stressed by her son and mother.  *Id.*  A review of Edwards's systems indicated she was normal except for her complaints of "low-grade chronic intermittent depression."  (Tr. 454).

Nurse Nossek's psychiatric examination noted that Edwards appeared well-groomed; had good abstraction and attention, normal speech, a blunted affect, unremarkable thought content, a cooperative attitude, good impulse control, above average intelligence, fair insight and judgment, intact memory and thought processes, no homicidal or suicidal thoughts, and no perceptual disorders; and she was fully oriented.  (Tr. 455).  Nurse Nossek also noted that Edwards had "low-grade persistent depression and intermittent anxiety," and assessed her with bipolar I disorder with depression.  *Id.*  She continued Edwards's medications.  *Id.*

On December 4 and 18, 2019, Edwards saw Howell for counseling.  (Tr. 449-452).  During both sessions, Howell noted that Edwards was engaged, and Edwards reported that she was sad about her family's disinterest in the holiday, but her work was going well.  *Id.*  During her first session, Edwards indicated that she liked her job, but she wanted more hours and needed to make more money.  (Tr. 451).  Howell observed, during both sessions, that Edwards had a cooperative attitude, lacked homicidal or suicidal thoughts, had a sad mood, and was fully oriented.  (Tr. 449-452).  Howell noted Edwards also showed anxiety in relation to her bipolar disorder, and maintained her goal to reduce Edwards's anxiety from a 10 to a 6.  (Tr. 449, 451).

On January 6, 2020, Edwards saw Nurse Nossek.  (Tr. 445).  Edwards reported that her depression and anxiety symptoms were fair, her anger and irritability symptoms were under controlled, she was tired but slept 7 to 8 hours a night, and she did not have any side effects or new concerns or stresses.  *Id.*  She also reported that she had a depressed mood, rating it as 5/10; had thoughts of worthlessness; and rated her anxiety as 3/10.  *Id.*  Edwards indicated she was working 16 hours.  *Id.*  In a review of her systems, Edwards reported low-grade chronic

intermittent depression.  (Tr. 446-447).  Nurse Nossek's psychiatric examination was largely the same as her prior examination, adding that Edwards had above average intelligence.  (Tr. 447).  Her assessment remained unchanged, and she continued Edwards's medication.  *Id.*

On January 20, 2020, Edwards saw James Gallagher, M.D.  (Tr. 292-293).  Edwards reported working 16 hours a week and looking for a more administrative position.  (Tr. 292).  She indicated she was with a counselor, but "could not find anyone else;" and the counselor had diagnosed her with bipolar disorder, anxiety, and depression.  *Id.*  She reported that she did not feel she was making any headway, had more good than bad days, and spoke with a minister, whom she found helpful.  *Id.*  Edwards was on Aldactone, Effexor, and Topamax.  *Id.*  Dr. Gallagher did not change her medications for her anxiety and depression.  (Tr. 293).

On January 15, January 29, and February 14, 2020, Edwards had additional counseling sessions with Howell.  (Tr. 440-444).  Edwards was engaged during every session but was noted as either tearful or as stating that that she was not doing well at work; she had regrets about pursuing her bachelor's degree, or felt stress about her son or her employment.  *Id.*  During her January 15 session, Edwards stated that she felt she should be doing administrative work, rather than patient care, noting that her current position saddened her, and her son noticed.  (Tr. 443).  During that session, Howell conducted a psychiatric exam, noting that Edwards had a cooperative attitude, fair insight, a sad mood, and was fully oriented.  *Id.*  As to her job, Howell encouraged Edwards to continue with her degree and to continue applying for jobs.  (Tr. 440-441).  Howell's goals remained the same throughout the sessions.  (*See* Tr. 440-444).

On March 4, 2020, Edwards saw Nurse Nossek.  (Tr. 436-439).  Edwards's report was, generally, the same as at her prior appointment, but she rated her depression as 6/10 and her anxiety as 4 to 5/10.  (Tr. 436).  She noted her anxiety was related to financial stress, she was not

5

using Xanax, she had been "down" since a work incident, and she had not worked for a month. *Id.*  A review of Edwards's systems and Nurse Nossek's psychiatric examination were the same as before.  (Tr. 438).  Nurse Nossek continued Edwards's medications.  *Id.*

On March 11, 2020, Edwards saw Howell for counseling.  (Tr. 435).  Howell noted that Edwards's was engaged, and Edwards reported she interviewed for a new job but felt discouraged.  *Id.*  Howell validated her feelings and encouraged her to not give up and work on being more positive.  *Id.*  Howell's goal remained unchanged.  *Id.*

On March 19, 2020, Edwards saw Dr. Gallagher, reporting that she had a hard time getting out of bed on her psychiatrically bad days, which happened a couple of times a week. (Tr. 290-291).  Dr. Gallagher continued Edwards's medication, noting Edwards's history of anxiety, depression, and bipolar disorder, and that she could not find a psychiatrist.  *Id.*

On May 18, 2020, Edwards saw Erica Bennett, LPCC-S , for a teletherapy session. (Tr. 433-434).  Edwards was meeting with Bennett while Howell was temporarily laid off. (Tr. 433).  Edwards reported that for several weeks she had been feeling more anxious than usual.  *Id.*  She felt she could not get motivated to complete a task; and she worked on identifying her anxious thoughts, their triggers, and daily goals to accomplish.  *Id.*

On May 21, 2020, Edwards saw Dr. Gallagher.  (Tr. 288-289).  Edwards reported that she had anxiety and depression, could not focus or hold down a job, she was seeking a counselor, and her nurse practitioner wanted her to start Abilify.  (Tr. 288).  Dr. Gallagher continued her medication and noted her mental health conditions.  (Tr. 288-289).

On June 2, 2020, Edwards saw Nurse Nossek.  (Tr. 430-432).  Edwards reported worsening symptoms, feelings of worthlessness, poor sleep, and days when it was hard for her to get out of bed; she rated her depression as 6/10, and noted that she did not like taking pills.

6

(Tr. 430). She also rated her anxiety as 8/10, noting she had a sudden onset of anxiety with an upset stomach and difficulty breathing. *Id.* A review of Edwards's systems and Nurse Nossek's psychiatric examination were, generally, the same as at her prior appointments. (Tr. 431-432). Nurse Nossek continued Edwards's medications, adding Zoloft. *Id.*

On June 8, 2020, Edwards saw Bennett for a counseling session. (Tr. 428-429). Edwards reported that writing down her daily goals helped her accomplish them, and she applied to a new job. (Tr. 428). She felt anxious about starting a new job and worked on ways to reduce her spiraling thoughts and increase her relaxation skills and positive self-talk. *Id.*

On June 24, 2020, Edwards saw Nurse Nossek, reporting her depression and anxiety symptoms were fair, her anger and irritability symptoms were under control, and she was tired but slept 7 to 8 hours. (Tr. 424-427). She reported improvement since her last appointment, rating her depression as 4 to 6/10, that her anxiety was "a little better," and she could sit still without feeling anxious. (Tr. 424). However, she also reported that she struggled with her concentration. *Id.* A review of Edwards's systems and Nurse Nossek's psychiatric examination were, generally, the same as Edwards's prior appointments. (Tr. 426). Nurse Nossek's assessment remained unchanged, and she continued Edwards's medications. *Id.*

On June 29, 2023, Edwards met with Howell, reporting that she was not doing well and felt like a failure for not getting a new job and her child did not want to do anything. (Tr. 422-423). She indicated her anxiety had been "through the roof," and she felt like she would never get a job. (Tr. 422). Howell discussed perseverance and changing her negative self-talk. *Id.* On examination, Howell noted that Edwards had a cooperative attitude, was oriented, and had a depressed mood. *Id.* Howell maintained her goal to reduce Edwards's anxiety. (Tr. 423).

On July 13, 2020, Edwards saw Howell, reporting that her condition was largely the same, but she had been going to church twice a week, despite not having much interest there. (Tr. 420-421).  She felt unmotivated to go anywhere, but her husband made them go for a drive and she felt okay once they were out.  (Tr. 420).  She also reported increased negative thoughts towards herself, struggling to take showers, and discomfort with her nurse practitioner.  *Id.* Howell assisted Edwards in finding some positive thoughts, noting Edwards was making little progress.  *Id.*  Howell's psychiatric examination noted that Edwards had a cooperative attitude, was fully oriented, and had a depressed, tearful mood.  *Id.*

On July 23, 2020, Edwards saw Dr. Gallagher, reporting that the nurse practitioner took her off Effexor and started her on Zoloft.  (Tr. 360-361).  She indicated she felt less anxious off Effexor but did not feel right on Zoloft.  (Tr. 360).  She was still on Aldactone and Topamax.  *Id.* Dr. Gallagher agreed with her seeking a psychiatrist.  (Tr. 361).  He noted her anxiety and depression, but questioned the nurse practitioner's bipolar diagnosis.  *Id.*

On July 27, 2020, Edwards saw Howell, reporting that her depression was about the same and she continued to feel like a failure.  (Tr. 418-419).  She felt hopeful about an upcoming family trip and in starting treatment with a new psychiatrist.  (Tr. 418).  Howell encouraged Edwards to give herself credit for small accomplishments and assisted her in some parenting skills.  *Id.*  Howell observed that Edwards had a cooperative attitude, had a depressed mood, and was fully oriented.  (Tr. 418-419).

On July 31, 2020, Edwards saw Rebecca Schlachet, D.O., for medication management, reporting that she had concentration issues since discontinuing Effexor and starting Zoloft. (Tr. 414).  Edwards recounted starting therapy for depression in elementary school and starting medication in her 20s; she noted that her nurse practitioner diagnosed her with depression,

anxiety, and bipolar disorder.  *Id.*  She reported that she had the following depression symptoms: anhedonia, "not seeing a light at the end of the tunne[l]", being emotional, tearfulness, a lack of motivation/interest, and, although not suicidal, she occasional thought it would be better if she was not there.  *Id.*  Edwards also reported her depression and anxiety had worsened since she lost her job two years prior, and she was not sure the medication was helping because she was feeling worse.  *Id.*  She could no longer fake feeling well and had previously experienced periods of up to a week where she would talk fast, have lots of ideas she could not get out, have an elevated mood, and would constantly be doing things.  *Id.*  She also had the following anxiety symptoms: "forgetting to breathe, chest tight[ness], negativity, feel[ing] overwhelmed, worrie[d] excessively, could not turn her mind off, hard to sleep due to worry."  *Id.*  She reported that she had poor coping mechanisms and situational factors contributed to her depression.  *Id.*

In a review of her systems, Edwards indicated that she had fatigue, sleep disturbances, and difficulty sleeping.  (Tr. 414-415).  Dr. Schlachet observed that Edwards had fair grooming; good abstraction, attention, impulse control, insight, and judgment; a dysphoric, tearful affect; low aggression; cooperative attitude; average intelligence; depressed mood; normal speech; and a linear, goal-directed thought process.  (Tr. 416).  She also noted that Edwards was fully oriented and had normal psychomotor activity.  *Id.*  Dr. Schlachet assessed that Edwards had generalized anxiety disorder and bipolar II disorder, moderate, depressed, with anxious distress, and adjusted her medication, tapering her off Abilify and increasing her Zoloft.  *Id.*

On August 10, 2020, Edwards saw Howell, reporting she felt anxious and like she had "nervous energy," but could not pinpoint the cause of her anxiety.  (Tr. 412).  After some discussion, Howell and Edwards were able to conclude that her son's schooling was anxiety provoking.  *Id.*  Edwards stated that she was afraid she would not be able to help him in school

9

and they discussed parenting skills.  *Id.*  Edwards also reported feeling better after speaking to her husband about how she felt like a burden, and that she felt heard with her new psychiatrist. *Id.*  She did not feel much change since her medication adjustment.  *Id.*  Howell noted she appeared more talkative and positive and observed that Edwards had a cooperative attitude, an anxious mood, was fully oriented, and had a normal degree of awareness of her surroundings. (Tr. 412-413).  Howell's goal remained unchanged.  (Tr. 413).

On August 14, 2020, Edwards saw Dr. Schlachet, reporting that she did not experience any side-effects from tapering down her Abilify and the increased Zoloft dosage improved her mood.  (Tr. 408).  She reported less tearfulness, sadness, hopelessness, and instances of somatic anxiety, but she continued to have a depressed mood, a lack of motivation, and chest tightness, although she did not have full panic attacks.  *Id.*  Her sleep and appetite were fine.  *Id.*  A review of her systems indicated she had fatigue.  (Tr. 408-409).  On examination, Dr. Schlachet's observations and assessment were largely the same.  (Tr. 410).  Dr. Schlachet continued tapering off Abilify, increased Edwards's Zoloft dosage, and continued her other medications.  *Id.*

On August 28, 2020, at Edwards's follow-up appointment with Dr. Schlachet, she reported that her depression symptoms were fair, her anxiety symptoms were "bothersome," and her anger and irritability symptoms were under control.  (Tr. 403).  She noted that she was not sure the medication improved her feelings and she felt more anxious, although she noted that when she previously went off Abilify her anxiety had increased.  *Id.*  She continued to have less tearfulness, hopelessness, tightness in her chest, and a lack of motivation/interest, but also had feelings of dread, a queasy stomach, and was fidgety.  *Id.*  Edwards noted that she had enjoyed her family's vacation and went to church twice a week.  *Id.*  The review of her systems and

10

Dr. Schlachet's observations and assessment remained unchanged; she continued to increase Edwards's Zoloft dosage and her other medications.  (Tr. 404-406).

On August 31, 2020, Edwards saw Howell, reporting that her family vacation was good, and her son had been happy.  (Tr. 401).  She continued to have decreased weepiness, but persistent lack of motivation, tightness in her chest, and racing thoughts, noting she did housework but was unmotivated.  *Id.*  Howell observed that Edwards had a cooperative attitude, a content mood, and was fully oriented.  *Id.*  Howell noted her objectives of aiding Edwards to express an understanding of the relationship between her depression and repressed feelings, express more positive statements, and implement an exercise regime.  *Id.*

On September 14, 2020, Edwards again saw Howell, reporting continued anxiety, troubled sleep, and that she was not attending church.  (Tr. 399).  She felt "like an[] empty shell of a person."  *Id.*  Howell encouraged Edwards to sit outside while her son was in school, she observed that Edwards was fully oriented and had a flat affect, fair attention, cooperative attitude, and depressed mood.  *Id.*  Howell's objectives remained the same.  (Tr. 400).

On September 18, 2020, Edwards saw Dr. Schlachet, reporting that she did not feel like herself, she'd reduced her Zoloft dosage, her anxiety was unchanged, she had trouble sleeping, she did "not want to be bothered," and she continued to have tightness in her chest, feelings of dread, queasiness, and a dislike of leaving her home and being around people.  (Tr. 395).  She reported that reducing her Abilify and Zoloft did not worsen her depression, noting she was less weepy but always depressed.  *Id.*  A review of her systems and Dr. Schlachet's observations and assessment were the same.  (Tr. 395-397).  Dr. Schlachet decreased Edwards's Abilify and Zoloft dosages and continued her other medications.  (Tr. 397-398).

11

On September 24, 2020, Edwards saw Dr. Gallagher, reporting increased anxiety and that she had started seeing a new psychiatrist, who started her on Vraylar and continued her Lamictal and Abilify.  (Tr. 358-359).  She also reported not sleeping well and wondering whether she should stop taking doxycycline and Aldactone.  (Tr. 358).  Dr. Gallagher noted that Edwards's new psychiatrist still had her diagnosed as having bipolar disorder and permitted Edwards to discontinue the Aldactone and doxycycline and see how things went. (Tr. 359).

On September 28, 2020, Edwards saw Howell, reporting that her anxiety was the same and she worried about her son.  (Tr. 393).  Howell encouraged her to help her son with coping skills and to consider counseling.  *Id.*  Edwards reported that she considered getting a dog for companionship and to encourage her walk.  *Id.*  Howell noted that Edwards was fully oriented, had a cooperative attitude but an anxious mood; her objectives remained the same.  *Id.*

On October 9, 2020, Edwards saw Dr. Schlachet, reporting that her depression and anxiety symptoms were bothersome, and her anger and irritability symptoms were 'terrible."  (Tr. 388).  She had not noticed any benefits of her medication changes yet and reported having occasional troubled sleep and that her anxiety was exacerbated when she left home and was around others.  *Id.*  She also reported continued to experience anxiety, tightness in her chest, feelings of dread, queasy stomach, fidgeting, chronic feelings of worthlessness and worries, and depression, but was less tearfulness and "maybe" a bit more motivated.  *Id.*  A review of Edwards's systems and Dr. Schlachet's observations and assessment remained the same.  (Tr. 389-391).  She stopped Edwards's Abilify, increased her Vraylar, and continued her other medications.  (Tr. 391).

On October 16, 2020, Edwards saw Dr. Schlachet, reporting that she had side effects from the increased Vryalar dosage, so she reduced the dosage.  (Tr. 384).  She reported that her

anxiety was about the same, noting that she was less tearful but could be irritable, and that she never felt happy but was not always sad, estimating that she felt worthless and down about twice a week. *Id.* She continued to experience tightness in her chest, feelings of dread, a queasy stomach, fidgeting, and anxiety when out of her house or around people. *Id.* A review of her systems and Dr. Schlachet's observations and assessments remained the same. (Tr. 384-386). Dr. Schlachet stopped Edwards's Vryalar and continued her other medications. (Tr. 386-387).

On October 19 and November 4, 2020, Edwards saw Howell. (Tr. 380, 382). During both sessions, Edwards reported continued anxiety and feelings that she should either be going better or struggles to leave her house. *Id.* Howell encouraged Edwards to identify positive things she had done or to leave her house even for short periods. *Id.* Howell observed that Edwards had cooperative attitude, had an anxious mood, and was fully oriented, and her objectives for Edwards remained the same. *Id.*

On November 6, 2020, Edwards saw Dr. Schlachet, reporting that Latuda was giving her restless leg syndrome and Cogentin was helpful. (Tr. 376). She remained anxious and was not sure if the Latuda was helping, but also noted she was less tearful and depressed than a few months prior. *Id.* Edwards noted she was still irritable at times; felt discouraged and sad; lacked motivation, energy, and interests; was "possibly" not feeling as worthless; and had found that negative rumination fueled her depression. *Id.* A review of her systems and Dr. Schlachet's observations and assessments were unchanged. (Tr. 376-379). Dr. Schlachet increased Edwards's Latuda and Cogentin dosages and continued her other medications. (Tr. 378-379).

On November 18, 2020, Edwards saw Howell, reporting that she felt moody that day and like "nothing was possible." (Tr. 374). She reported feeling "stuck," and experiencing feelings

of worthlessness, a lack of interest in showering, and feeling that her situation was "as good as it gets." *Id.* Howell's observations about Edwards and objectives were the same. *Id.*

On December 4, 2020, Edwards saw Dr. Schlachet, reporting that she was tolerating her Latuda and Cogentin dosages, her sleep had improved, and she thought Latuda improved her mood. (Tr. 370). She was still sad and irritable at times, but noted a mild improvement in her motivation, and chronic feelings of emptiness, loneliness, and worthlessness. *Id.* Her anxiety and symptoms remained about the same. *Id.* A review of her systems and Dr. Schlachet's observations and assessments were largely the same as prior appointments. (Tr. 370-373). Dr. Schlachet increased Edwards's Latuda dosage, continued her other medications, and recommended transcranial magnetic stimulation because medication had only been partially helpful. (Tr. 373).

On December 9, 2020, Edwards saw Howell, reporting that she was anxious that day and did not want to leave her house. (Tr. 368). Edwards indicated she was talking to her husband about getting a dog, she felt irritable and antsy, she thought negative thoughts about the people at church, and felt irritable with those who did well. *Id.* She noted that she felt good after being complimented on cookies she baked, and Howell encouraged her to find things like that to do and to leave her house. *Id.* Howell's objectives remained the same. *Id.*

On January 22, 2021, Edwards saw Dr. Gallagher, reporting that she had been seeking her psychiatrist and her medication had helped her depression but increased her anxiety. (Tr. 495). He instructed her to continue meeting with her psychiatrist and counselor. (Tr. 496).

On March 19, 2021, Edwards again saw Dr. Gallagher, reporting that she had some anxiety, racing thoughts, and irritability, but her depression was better. (Tr. 493-494).

On March 19, April 23, and May 28, 2021, Edwards saw Dr. Schlachet. (Tr. 503-508). In April, Edwards reported that her depression symptoms were fair, her anxiety symptoms were bothersome, and her anger and irritability symptoms were fair. (Tr. 508). In both March and May, Dr. Schlachet's assessments remained largely the same, noting in May that Edwards had chronic depression and anxiety but less sadness. (Tr. 503-504, 506). Dr. Schlachet continued to adjust Edwards's medications. (Tr. 504, 506).

### C.      Relevant Opinion Evidence

#### 1.      Function Report – Lisa Edwards, July 6, 2020

On July 6, 2020, Edwards completed a function report. (Tr. 227-234). She stated that she felt "overwhelmed" with her anxiety and depression, which often led to issues with her concentration and motivation. (Tr. 227). She indicated that she felt like she was "barely getting by in [her] basic daily life activities." *Id.* As to her daily activities, she described how she would get up, sometimes shower, eat, take care of her son, watch television, spend time with her husband, make dinner, make sure her son went to bed, did "some type of house chore" when she could, and then went to bed. (Tr. 228). She indicated that she also took care of her son and the family dog. *Id.* Her husband would help with both as well. *Id.* Although her conditions made it so she did not shower or dress unless she had to, she tried to do so at least twice a week. *Id.* Her conditions also caused her to not do activities outside of the house and woke her up once or twice a night. (Tr. 228-229). She would prepare meals three to four times a week, making easy, quick meals or frozen dinners, but how long she spent depended on her concentration and motivation. (Tr. 229). She also did laundry, tried to clean the house, and did dishes; how long the chores took depended on her motivation and she tried to set goals and pace herself each day. *Id.* She needed encouragement to do the chores because she would get overwhelmed. *Id.*

Edwards indicated that she did not go outside often, but she could drive a car and go out alone. (Tr. 230). She would go shopping in stores or by computer for her family's basic needs, toiletries, and grocery items. *Id.* But she shopped as little as possible as quickly as possible because she was easily side-tracked; her husband usually did the shopping. *Id.* She did not have any trouble handling money. (Tr. 230-231). Her hobbies included watching television and listening to music, and she indicated her main interest and concern was her son. (Tr. 231). She explained that she did the best she could to continue doing these things since her conditions began. *Id.* She would spend time with her husband, son, and, occasionally, at her church, which she attended twice a week. *Id.* She did not need reminders to do things, and she did not have any problems getting along with others. (Tr. 231-232). She indicated that her conditions impacted her concentration and made her anxious and overwhelmed. (Tr. 232). She could pay attention for "sometimes minutes at a time," but she could finish what she started and follow written and spoken instructions pretty well. *Id.* She got along with authority figures, but had once been fired for contributing to a hostile work environment. (Tr. 233). She did not handle stress or changes to her routine well. *Id.*

### 2. Function Report – Lisa Edwards, November 5, 2020

On November 5, 2020, Edwards completed a second function report. (Tr. 247-254). Her reported daily activities and personal care were, largely, the same, adding that she "push[ed] through" her symptoms to accomplish more. (Tr. 247-248). She indicated that medication had previously helped with her sleep, but she was now waking up multiple times during the night and felt anxious. (Tr. 248). Her explanation of what she prepared for dinner and did around the house was, generally, the same. (Tr. 249). She would go outside about two to three times a week, and her shopping routine, hobbies, interests, and church attendance had not changed.

16

(Tr 250-251).  She indicated, however, that she did not like going out, she avoided interacting with people, and she did not always go to church.  *Id.*  Edwards reported that her conditions impacted her ability to concentrate and complete tasks, stating that "my depression and anxiety make me feel overwhelmed and make it hard to focus and stay on task.  It takes me longer to do things, sometimes making smaller goals helps."  (Tr. 252).  Her ability to interact with others and follow instructions had not changed.  *Id.*

### 3.   Mental Impairment Questionnaire – Teresa Howell

On March 8, 2021, Howell completed a mental health impairment questionnaire. (Tr. 491-492).  She had treated Edwards from September 17, 2018 through the date of her report for "bipolar disorder, current episode mixed, severe w/o psychotic features."  (Tr. 491).  She noted that Edwards reported chronic depression, severe anxiety, and social anxiety, and her prognosis was fair but noted that her bipolar mood changes were unpredictable.  *Id.*

Howell assessed Edwards's ability to have sustained concentration and persistence, finding that she was "unlimited or very good" except she had a "limited but satisfactory" ability in maintaining attention and concentration for extended periods of time, working in coordination with or in proximity to others without distracting them, and performing at a consistent pace without an unreasonable number and length of rest period.  *Id.*  She also had a seriously limited, but not precluded ability to complete a normal workday and workweek without interruptions from psychologically based symptoms.  *Id.*

Howell did not identify any limitation in Edwards's ability to understand and remember. (Tr. 492).  Howell identified that Edwards's ability to accept instruction and respond appropriately to criticism from supervisors was limited but satisfactory, and she was otherwise unlimited in that area of functioning.  *Id.*  Howell also concluded that Edwards was limited but

17

satisfactory in her ability to respond appropriately to changes in the work setting and in setting realistic goals or making plans independently of others but was unlimited in her ability to be aware of normal hazards and take appropriate precautions. *Id.* Howell indicated that she was unable to anticipate how often Edwards's impairments would cause her to be absent from work because of the unpredictability of bipolar disorder. *Id.*

### 4.     Psychological Evaluation – Thomas Evans, Ph.D.

On September 16, 2021, Thomas Evans, Ph.D. conducted a psychological evaluation of Edwards and completed a medical source statement as to her abilities. (Tr. 547-554). Dr. Evans's statement concluded that Edwards did not have any limitation in her ability to understand, remember, and carry-out instructions. (Tr. 547). He also concluded that Edwards had moderate limitations in her ability to interact appropriately with supervisors, co-workers, and the public and in responding to changes in a routine work setting. (Tr. 548). He noted that Edwards reported having difficulty completing paperwork. *Id.*

In Dr. Evans's related psychological evaluation, Edwards indicated she had been seeing a psychiatrist on a monthly basis for over a year, while a nurse practitioner oversaw her medication. (Tr. 551). She had been in counseling for three years and saw her counselor every two weeks. *Id.* Dr. Evans noted that Edwards drove; her husband helped her with cooking, cleaning, and laundry; and her husband did the grocery shopping and their finances. *Id.* On her typical day Edwards got her son ready for school, did household chores, and watched television. *Id.* Dr. Evans observed that Edwards was cooperative and friendly and had good personal grooming, hygiene, and eye contact; an easy rapport; normal speech; and a depressed mood and affect. (Tr. 551-552). He noted she did not have loose associations or tangential speech and she felt depressed daily for the past two months, rating her typical depression as 5 and 9. (Tr. 552).

Edwards described her symptoms as a having a depressed mood, fatigue, lacking motivation, being irritable, having anhedonia, and having feelings of helplessness and hopelessness.  *Id.*  She indicated that she had crying episodes a few times a week and denied any suicidal or homicidal ideation.  *Id.*  Edwards also reported to Dr. Evans that she had symptoms of anxiety that had persisted since childhood and had felt anxious on a daily basis for the past two months, noting she woke up anxious and had an increased heart rate, shortness of breath, feelings of restlessness, lack of focus, and chronic worrying that she cannot control/stop.  *Id.*  These symptoms occurred on and off throughout the day.  *Id.*

Dr. Evans observed that Edwards was fully oriented, successfully complete cognitive and memory exercises, and had adequate insight and social judgment.  *Id.*  He concluded that Edwards met the criteria for an unspecified depressive disorder and unspecified anxiety disorder. (Tr. 553).  He noted that "[n]o signs of bipolar were observed although she was significantly depressed."  *Id.*  As to her functioning, Dr. Evans concluded that Edwards did not appear to have difficulties understanding and carrying out simple to moderately complex instructions in a workplace setting.  *Id.*  As to the other areas of functioning, Dr. Evans recited Edwards's own statements and did not specify any functional limitations.  (Tr. 553-554).  He gave Edwards a poor prognosis, noting her symptoms were moderately severe.  (Tr. 554).

### 5.      State Agency Psychological Consultants

On August 10, 2020, Mary Hill, Ph.D., reviewed the medical evidence to evaluate Edwards's mental health limitations.  (Tr. 71-73).  Dr. Hill concluded that Edwards did not have any limitations to her understanding and memory, but she did as to her ability to have sustained concentration and persistence.  (Tr. 71).  Specifically, Dr. Hill concluded that Edwards had moderate limitations in her ability to (i) maintain attention and concentration for extended

19

periods; (ii) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (iii) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 72). In all other regards, Dr. Hill found that Edwards's ability to sustain concentration and persistence was not significantly limited or there was no evidence of a limitation. *Id.* Dr. Hill noted that Edwards "would retain the ability to sustain attention, concentration, persistence and pace to perform routine tasks that do not have fast-paced performance or strict production quota requirements." *Id.*

Dr. Hill also concluded that Edwards had limitations on her social interactions, particularly a moderate limitation in her ability to interact appropriately with the general public but was not otherwise significantly limited. *Id.* Dr. Hill noted that Edwards had "the capacity for superficial interaction w[ith] others. No negotiations or persuasion." *Id.* Dr. Hill also found that Edwards had adaptation limitations, having a moderate limitation in her ability to respond appropriately to changes in the work setting but was not otherwise significantly limited. *Id.* She noted that Edwards "[e]asily feels overwhelmed. Able to perform work in a static environment w[ith] advanced notice of changes." *Id.*

On January 8, 2021, Ermias Seleshi, M.D., reconsidered Edwards's limitations based on the medical record and affirmed Dr. Hill's findings and reasoning, particularly as to her findings of moderate limitations. (Tr. 80-81).

### D.    Relevant Testimonial Evidence

Edwards testified at the hearing. (Tr. 38-57). She explained that she had completed a degree in nursing but had not worked since January 2020. (Tr. 38). She had previously worked as a nurse for various companies and as a case manager, working to assist people with obtaining

home healthcare benefits.  (Tr. 38-45).  She explained that she could do laundry and prepare dinner, but usually tried to space out the various chores each day.  (Tr. 46).  She would prepare meals a couple of times a week, with her husband handling the other meals.  *Id.*  She would prepare such things as scrambled eggs for her son, but he liked prepared foods, like Hot Pockets and Pizza Rolls.  *Id.*  She helped him with his homework, and they played boardgames. (Tr. 46-47).  She read, spaced out her chores, supervised her son, and watched TV.  (Tr. 47-48). She liked to read romance novels and could follow the plot but, when watching television, her mind would sometimes wander.  (Tr. 48-49).  She could drive but did not like to.  (Tr. 49-50). Her husband would do the grocery shopping, but she had gone with him before.  (Tr. 50).  She saw a psychiatrist and was on medication.  (Tr. 50-51).  She would also let her dog outside, feed it, but her husband helped take it to the vet, and she did not clean up after it outside.  (Tr. 51). She explained that she tried to go to church, but she would get "really bad anxiety," so she was avoiding it for a little bit.  (Tr. 53).  She tried to shower twice a week.  (Tr. 54-55).

Edwards's medications had been frequently changed, but she had largely been on the same medication since the end of the last year.  (Tr. 55).  She felt that the medication helped her depression but not her anxiety.  (Tr. 55-56).  She was not doing transcranial magnetic stimulation because it was far away and required 30 days of consecutive treatment.  (Tr. 56).  Even if it was close, she did not think she would be able to complete it.  *Id.*  She thought that she would have a hard time working because she struggled to find her words, had a hard time dealing with people, and would be overwhelmed by her anxiety and depression.  (Tr. 57).

### III.    Law & Analysis

#### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.      Step Three: Medical Listings 12.04 and 12.06

Edwards contends that the ALJ erred in evaluating her mental health conditions under Medical Listings 12.04 and 12.06.  ECF Doc. 6 at 8-17.  She argues that the ALJ: (i) should have found that she was seriously limited across all three areas of functioning in which the ALJ found only moderate limitations, (ii) failed to provide sufficient explanation, and (iii) improperly considered her daily activities.[3]  ECF Doc. 6 at 8-15.  The Commissioner disagrees.  ECF Doc. 8 at 9-16.  Edwards's reply brief does not address this issue.  *See* ECF Doc. 9.

At Step Three, a claimant has the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).  "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing."  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of SSA*,

---

[3] Because Edwards's contentions only challenge the ALJ's findings as to the Paragraph B criteria, the scope of my review will be accordingly limited.

544 F. App'x 639, 641-42 (6th Cir. 2013)).  "Rather, the claimant must point to specific evidence

that demonstrates he reasonably could meet or equal every requirement of the listing."  *Id.* (citing

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  "Absent such evidence, the ALJ does not commit

reversible error by failing to evaluate a listing at Step Three."  *Id.* at 433; *see also Forrest v.*

*Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a

claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 12.04 establishes the criteria for affective disorders, while Listing 12.06

establishes the criteria for anxiety-related disorders.  20 C.F.R. pt. 404, Subpt. P, App. 1

§§ 12.04, 12.06.  To meet the Listings' severity level for either form of disorder, the claimant

must show that she meets: (1) the impairment-specific medical criteria in Paragraph A; and

(2) the functional limitations criteria in Paragraphs B or C.  20 C.F.R. pt. 404, Subpt. P, App. 1

§§ 12.00(A), 12.04, 12.06.

To meet Paragraph A for affective disorders, the claimant must show medical

documentation of:

> (1) Depressive disorder, characterized by five or more of the following:
> (a) depressed mood; (b) diminished interest in almost all activities; (c) appetite
> disturbance with change in weight; (d) sleep disturbance; (e) observable
> psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or
> worthlessness; difficulty concentrating or thinking; or (i) thoughts of death or
> suicide[; or]
>
> (2) Bipolar disorder, characterized by three or more of the following:
> (a) pressured speech; (b) flight of ideas; (c) inflated self-esteem; (d) decreased
> need for sleep; (e) distractibility; (f) involvement in activities that have a high
> probability of painful consequences that are not recognized; or increase in
> goal-directed activity or psychomotor agitation.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04(A).

In comparison, to meet paragraph A for anxiety-related disorders, the claimant must show medical documentation of:

> (1) Anxiety disorder, characterized by three or more of the following:
> (a) restlessness; (b) easily fatigued; (c) difficulty concentrating; (d) irritability;
> (e) muscle tension; or (f) sleep disturbance[;]
>
> (2) Panic disorder or agoraphobia, characterized by one or both: (a) panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; or (b) disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces)[; or]
>
> (3) Obsessive-compulsive disorder, characterized by one or both: (a) involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or
> (b) repetitive behaviors aimed at reducing anxiety.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.06(A).

To meet Paragraph B for either listing, the claimant must show that his disorder resulted in an "extreme limitation of one or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself." 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B).

The ALJ applied the proper legal standards and reached a determination supported by substantial evidence in determining that Edwards did not meet or medically equal Listings 12.04 or 12.06. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Edwards contends that the ALJ erred in failing to find that she had more than moderate limitations in the following areas of mental functioning: (i) understand, remember, or apply information; (ii) interact with others; and (iii) concentrate, persist or maintain pace.  ECF Doc. 6 at 13-14.  The ALJ did not address whether Edwards's medical evidence met the requirements of Paragraph A for either Listing. (*See* Tr. 16-17).  However, because a claimant must show that she meets *both* the Paragraph A

and Paragraph B criteria in order to be found disabled under Listing 12.04 and/or 12.06, once the ALJ determined that Edwards did not meet the Paragraph B criteria, Edwards could not qualify as disabled at Step 3, provided that the ALJ's Paragraph B conclusion was supported by substantial evidence.  *See Kobetic v. Comm's of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (reasoning that remand is not required when it "would be an idle and useless formality" (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)).  Here, the ALJ met her obligations in reviewing Edwards's mental health conditions under the Listings.  Specifically, the ALJ (i) addressed all of the specific Paragraph B areas of functioning, (ii) addressed the Paragraph C criteria, (iii) noted Edwards's subjective statements regarding the areas of functioning, and compared Edwards's statements to the medical evidence, and (iv) provided citations to the evidence supporting her conclusions that Edwards had only moderate limitations in the three contested areas of functioning.  *See Reynolds*, 424 F. App'x at 416; (Tr. at 16-18).  With such detail, the ALJ satisfied each of the regulatory obligations and provided sufficient explanation for meaningful review.  *See Reynolds*, 424 F. App'x at 416; 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06.

Substantial evidence supports the ALJ's conclusion that Edwards had only moderate limitations in the three challenged areas of functioning under Listings 12.04 and 12.06 (Edwards's ability to understand and remember, socially interact, and maintain concentration and pace).  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  First, as to her moderate limitation in understanding and remembering, such evidence includes: (1) psychological and counseling notes that routinely noted she had an intact memory and thought process, unremarkable thought content, and/or good attention (*see* Tr. 372, 378, 386, 390, 397, 399, 405, 410, 416, 426, 432, 438, 447, 455, 503); (2) Howell's routine observation that Edwards was engaged during their

sessions (*see* Tr. 435, 440, 443, 449, 451); and (3) medical opinion evidence indicating she had only moderate limitations, if any, in this area (*see* Tr. 72, 80-81, 492, 547, 553).  As to her ability to interact with others, the ALJ's conclusion was likewise supported by substantial evidence, which included: (1) routine notations that she was cooperative during her examinations or counseling sessions (*see e.g.*, Tr. 372, 378, 386, 390, 397, 399, 405, 410, 416, 426, 432, 438, 447, 455, 503); (2) her own statements that she would attend church or go shopping (*see* Tr. 231, 251, 403, 420); and (3) medical opinion evidence that she had only moderate limitations, if any in this area (*see* Tr. 72, 80-81, 492, 548).  Finally, as to her concentration, persistence, and maintenance of pace, such evidence includes: (1) routine notations from her psychiatric examinations that she had good attention and focus (*see* Tr. 372, 378, 386, 390, 397, 399, 405, 410, 416, 426, 432, 438, 447, 455, 503); (2) Edwards's own reported ability to follow books and to, albeit only occasionally, maintain focus and motivation in making meals and completing chores (*see* Tr. 46-49, 229, 232); and (3) medical opinions findings only moderate limitations, if any (*see* Tr. 72, 80-81, 491, 547-548, 553).  *See Biestek*, 139 S. Ct. at 1154.

Edwards also challenges the ALJ's analysis of the medical listings based on her reference to Edwards's daily living activities, citing *Lorman v. Comm'r*, 107 F. Supp.3d 829, 838-839 (S.D. Ohio May 8, 2015) and *Aubin v. Comm'r of Soc. Sec.*, No. 1:20-CV-2206, 2022 U.S. Dist. LEXIS 8040 (N.D. Ohio Jan. 14, 2022).  ECF Doc. 6 at 16.  However, the relevant contentions in both of these cases relate to the ALJ's analysis under Step Four of the sequential evaluation process – not under Step Three, as applied here.  Even assuming the analyses of these cases applied, their reasoning renders the argument unpersuasive.  While a claimant's ability to complete some daily activities *alone* may not constitute substantial evidence, they can demonstrate that the claimant is not as disabled as alleged.  *See Lorman*, 107 F. Supp. 3d

at 838-39.  And, as the ALJ's references to the medical evidence – in combination with Edwards's daily activities – shows, the ALJ relied on more than Edwards's daily activities alone to support her finding that Edwards did not meet the Listings.  (*See* Tr. 16-18).  As a result, the ALJ's finding that Edwards lacked more than moderate limitation in the three remaining areas of mental functioning was supported by substantial evidence and should be affirmed.  *See O'Brien*, 819 F. App'x at 416.

### C.    Step Four: Medical Opinion Evaluations

Edwards raises two distinct arguments regarding the ALJ's assessment of her claim at Step Four.  First, she argues that the ALJ failed to incorporate limitations in her RFC related to her marked limitation in adapting and managing herself.  ECF Doc. 6 at 15-17.  Second, Edwards challenges the ALJ's finding that Howell's opinion was only "partially persuasive," and Dr. Evans's notation that she was "tearful" and had trouble getting along with others.  ECF Doc. 6 at 18-21.

The Commissioner disagrees, noting that, as to Edwards's ability to adapt and manage herself, the state agency consultants found lesser limitations.  ECF Doc. 8 at 11-12 & n.4, 16-23.

In her reply brief, Edwards contends that the Commissioner's reference to the state agency consultants constitutes a *post hoc* rationalization, and otherwise reiterates her arguments.  ECF Doc. 9 at 1-3.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite her impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the

[ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

As part of the ALJ's consideration of all the relevant evidence under Step Four, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[4] According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Although the ALJ applied the correct legal standards in evaluating Dr. Evans's opinion and addressing Edwards's marked limitation in adapting and managing herself, the ALJ failed provide sufficient explanation of her analysis of Counselor Howell's opinion, and, thus, a remand would be warranted unless the error is harmless. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. First, as to Edwards's allegation that the ALJ failed to include limitations as to her

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

adaptation and social interaction, Edwards's contentions fail.  The ALJ's RFC specifically included limitations related to the predictability of her work situations and changes, stating she could work in situations "where duties are generally predictable and handle occasional changes in a routine work setting that are explained in advance and implemented slowly," and that she could "have no interaction with the general public and occasional interaction with supervisors and coworkers.  However, with coworkers, she cannot engage in tasks that require persuasion, negotiation, or conflict resolution and engaged in team or tandem tasks."  (Tr. 18).  These reflect the exact characteristics addressed by the adaptation and managing oneself area of functioning challenged by Edwards.  *See* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(E)(4).[5]  Accordingly, Edwards's challenge to the ALJ's RFC in this regard fails.

As to Dr. Evans's observations, the ALJ complied with the proper legal standards in her treatment of Dr. Evans's opinion.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  First, as to Edwards's "tearfulness," tearfulness is not a functional limitation, particularly when it is merely an observation as to an individual's demeanor during a particular interview.  Second, Edwards contends that the ALJ failed to account for Dr. Evans's observation that Edwards had trouble getting along with others.  *See* ECF Doc. 6 at 21.  However, the ALJ did find that Edwards was

---

[5] Listing 12.00(E)(4) states:

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting.  Examples include: responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.00(E)(4).

moderately limited in her ability to interact with the public (*see* Tr. 23). Consequently, the

ALJ's treatment of Dr. Evans's opinion is not a basis for remanding the decision.

Lastly, however, the ALJ erred in applying the legal standards to her evaluation of

Howell's medical opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ, after

summarizing the limitations in Howell's opinion, stated:

> The undersigned finds this opinion to be partially persuasive as it is a check box
> form and does not provide further explanation for the limitations. Nonetheless,
> the opinion is generally consistent with the record as a whole.

(Tr. 22-23). And then the ALJ proceeded to recite the limitations she incorporated in Edwards's

RFC. (Tr. 23). The ALJ never stated or otherwise indicated which of Howell's opined

limitations she found persuasive. And the ALJ did not identify those limitations which she

concluded were unpersuasive. Nor did the ALJ explain how the limitations Howell had opined

Edwards suffered from were consistent with the record as a whole. In fact, the remainder of the

paragraph does not contain any citations to the record.

The Commissioner contends that the ALJ satisfied the regulation's requirements to

discuss supportability and consistency by stating it was a check-box form and lacked explanation

and by indicating the opinion was consistent with the record as a whole. ECF Doc. 8 at 19-20.

The latter argument is not well taken. First, it is disingenuous to argue that a reference to the

record *in its entirety* provides a basis for meaningful review. There are 266 pages of medical

records in the administrative record. And it is not uncommon for medical records in such cases

to reach into the thousands of pages. An ALJ who finds an opinion to be consistent (or

inconsistent) with "the record as a whole" has failed to articulate with *specificity* the reasons for

her findings and conclusions. This "deprives the Court of the ability to conduct any meaningful

review." *Bledsoe v. Comm'r of Soc. Sec.*, No. 1:09-cv-564, 2011 U.S. Dist. LEXIS 11925,

at *12 (S.D. Ohio Feb. 8, 2011) (internal quotation marks omitted). Absent further explanation, the court (and more importantly Edwards) is left to guess as to what portion of Howell's limitation the ALJ found persuasive and how they were supported by the record, meaning the ALJ failed to build the logical bridge necessary for meaningful subsequent review. *See Fleischer*, 774 F. Supp. 2d at 877.

Even if we were to credit the Commissioner's argument that the ALJ adequately concluded that Howell's opinions were consistent with the record as a whole, completely absent from the ALJ decision was any discussion of whether Howell's own treatment history and records supported all of the limitations she found in Edwards. Thus, the ALJ did not show that she had adequately discussed the supportability of the Howell opinions. And because we don't know *which* of Howell's conclusions were adopted and which were not, our ability to engage in meaningful review has been impeded. For these reasons, I find that the ALJ failed to meet the regulatory standards in her analysis of the Howell opinions.

Our analysis does not end there, however. Notwithstanding the above conclusion, I find that the ALJ's insufficient discussion was harmless error. An error in an ALJ's evaluation of the opinion evidence may be harmless when the opinion was "so patently deficient that the Commissioner could not possibly credit it." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). The Sixth Circuit has held that check-box forms, such as Howell's, meet the patently deficient standard. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016). Thus, even though the ALJ's discussion was insufficient to satisfy the articulation requirements for evaluation of medical opinions, the error was harmless because the ALJ had an independent basis for rejecting the opinion, which she specifically stated. *See Paradinovich v. Comm's of Soc. Sec.*, No. 1:20-CV-01888, 2021 U.S. Dist. LEXIS 213589, at *24-25 (N.D. Ohio

Sept. 28, 2021). Thus, any error in the ALJ's explanation for how she analyzed the Howell opinions did not cause legal harm to Edwards because the opinion could not be credited in the first place. Accordingly, I recommend that the ALJ's decision be affirmed.

## IV. Recommendation

Although the ALJ failed to apply proper legal standards in evaluating Howell's opinion, because the error was ultimately harmless, I recommend that the Commissioner's final decision denying Edwards's application for DIB be affirmed.

Dated: March 10, 2023

Thomas M. Parker
United States Magistrate Judge

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).